**Alan L. BENNETT, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 02–05 Erie.**

United States District Court, W.D. Pennsylvania.

Feb. 25, 2003.

Terry Toomey, Esq., Bukac and Toomey, Meadville, PA, for plaintiff.

Christian A. Trabold, Esq., United States Attorney's Office, Erie, PA, for defendant.

## MEMORANDUM OPINION

McLAUGHLIN, Judge.

In this case Plaintiff Alan L. Bennett has appealed the final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB) and a period of disability under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. The Administrative Law Judge (ALJ) determined that Bennett was not disabled within the meaning of the Act inasmuch as there were a substantial number of jobs in the national economy which he was capable of performing, including work as a sales counter worker, unskilled cashier, or unskilled general office clerk.

Plaintiff filed his application for DIB on July 24, 1997, alleging a disability onset date of May 14, 1993 due to back problems and depression. He maintained insured status as of his alleged disability onset date through December 31, 1999. Plaintiff's claim was denied at the initial and reconsideration levels of review. He received a *de novo* hearing before an Administrative Law Judge ("ALJ") on January 11, 1999. By written decision dated February 26, 1999, the ALJ denied Bennett's claim for benefits. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on November 7, 2001. This appeal was then timely filed. For the reasons set forth below, we will vacate the decision of the Commissioner and remand for further administrative proceedings.

## I. BACKGROUND

Bennett was thirty-six years old at the time of the ALJ's adverse ruling. He has

nine years of formal education, a G.E.D., and prior work experience as a machine operator and a punch press operator. (R. 45–46.) He has a history of substance abuse and alcoholism, having begun drinking at the age of eight or nine. (R. 439, 497.) He was evicted from his parents' house at the age of fifteen because of his substance abuse problems and has been arrested numerous times for alcohol-related offenses, including drunk driving. (R. 178, 439.) Bennett also has a long-standing history of depression stemming from the age of six or seven when his mother passed away. (R. 438, 497.) During the period of his alleged disability, further problems with personal relationships and finances, as well as his ongoing difficulties with substance abuse and chronic back pain, have apparently contributed to his depression.

## A. Bennett's Physical Impairments

In February of 1993 Bennett suffered a work-related injury to his lower back. He received conservative treatment thereafter, including physical therapy, work hardening, chiropractic manipulation, and epidural injections. (R. 337–39.) Because of persistent symptoms, including radiating low back pain and intermittent foot numbness, he was referred for a myelography and CT scan in July of 1993 which revealed a central and right paracentral disc herniation at the L4–5 level with mild-to-moderate impression on the thecal sac. (R. 339, 423–24.) Bennett underwent a lumbar laminectomy in July of 1993, which was performed by Brian Dalton, M.D. (R. 120–26.) A subsequent MRI of the spine in September of 1993 was interpreted as showing postoperative changes at the L4–5 level with recurrent central disc herniation and encasement of the right L–5 nerve root by scar tissue. (R. 422.)

By November of 1993, Bennett exhibited an active range of motion in his lower back and had only minimal tightness in his hamstrings, quadriceps and calf muscles. He returned to work for a single day in December of 1993. Nevertheless, he continued to complain of pain in his lower back radiating down his right side as well as pain between his shoulder blades. (R. 336.) In February and March of 1994 he received trigger point injections from Robert Concilus, M.D., with whom he had begun treating in June of 1993. (R. 334–36.) He returned to light duty at work, was prescribed a membership at the YMCA, and underwent further chiropractic treatments. (R. 94, 175, 178, 322–28, 334–36, 419.) As of April 19, 1994, Dr. Concilus noted that Bennett had a fairly good range of motion in his lower back. Extension was normal, there was no tenderness in his mid-thoracic region, and he could stand on his toes and heels. (R. 332.) However, Bennett had terminated his home-exercises and chiropractic treatments because he felt they were not significantly helping him. He also had not used his YMCA membership. Dr. Concilus felt that Bennett needed to take initiative to exercise in order to avoid chronic problems, and he questioned whether this had been occurring. (Id.) On April 28, 1994, Bennett had a confrontation with Dr. Dalton over his continuing symptoms, which resulted in the termination of his employment. (R. 419.)

Two months later, Bennett began treating with his current orthopedic surgeon, James Macielak, M.D. (R. 153, 419–21.) At that time, Bennett was complaining of severe and constant pain. Dr. Macielak referred Bennett for another CT scan in July of 1994, which showed a bulging of the annulus at the L4–5 disc space. There was some suggestion that this bulging was asymmetric into the area of the foramina, consistent with a recurrent foraminal disc

herniation. (R. 173–74, 417–18.) An MRI and bone scan of the thoracic spine were performed in September of 1994 and interpreted as normal. (R. 168–69.)

On November 23, 1994, Dr. Macielak performed a revision laminectomy and discectomy in order to relieve compression present at the L–5 nerve root. (R. 151–59.) By January of 1995, however, Bennett was again complaining of nearly constant back pain that worsened with physical activity. He reported experiencing leg shaking and even having his legs give out on him on one occasion. (R. 163.) On examination Dr. Macielak noted moderate paraspinal muscle spasms and exquisite tenderness in and around his incision site, as well as marked limitation in lumber extension and flexion. Straight leg raise testing produced right leg pain to the knee, but was negative on the left. X-rays taken that day showed a laminotomy defect at the L4–5 level without evidence of pars defect; a lateral view indicated a preserved disc space with no erosion. Bennett was continued on Percocet and started on Lioresal to control his back spasms. It was Dr. Macielak's opinion that Bennett was not capable of working at that time. (R. 163.)

In December of 1995, Bennett underwent a consultative evaluation by Garrett W. Dixon, M.D. (R. 181–87.) Although Bennett told Dr. Dixon that his 1994 surgery had improved his leg pain, he still complained of constant pain between his shoulders, accompanied by frequent spasms, and less intense lower back pain radiating to his right leg, accompanied with intermittent right foot numbness. He reported that his pain was aggravated by reaching forward or overhead, standing, lifting and carrying, and mitigated by lying down and taking medication. Bennett acknowledged that he had not been attending the YMCA because he felt it was "too hard on him." He reported that he could lift up to 25 pounds but could not hold it for long and that casual walking was "not bad." (R. 181.) In terms of daily activities, he claimed to be capable of doing a little fishing and tried to work on his car when he could. He also ran errands, shopped and did a little yard work; however, he found repetitious tasks bothersome and had to lie down every day for varying periods of time. At that time, Bennett was taking Talwin NX and Flexeril for his symptoms, which he found helpful. Physical therapy had reportedly made his symptoms worse. Injection therapy and chiropractic treatments had provided no lasting benefits. (R. 181–82.)

On examination, Dr. Dixon noted tenderness in Bennett's upper back, lumbar and gluteal regions. (R. 183–85.) Mild spasms were observed in Bennett's right lumbar area. Mid-calf circumference was symmetrical, sitting straight-leg-raise testing was negative bilaterally, and motor exam showed essentially normal strength in Bennett's shoulders, forearms, wrists, hands, hip, knees and ankles. Sensory testing revealed a slight decrease in the right S–1 dermatome. However, reflexes were 2 bilaterally in Bennett's biceps, quadriceps, hamstrings and Achilles. Lumbar range of motion was limited to 60 degrees flexion, 20 degrees extension, and 15 degrees laterally. He exhibited a normal casual gait, could heel and toe walk and squat without difficulty, and appeared to endure the examination without discomfort. (*Id.*) Dr. Dixon's impression was: 1. chronic low back pain, failed back syndrome with mild residual right L–5 radiculopathy; 2. depression (chronic); 3. alcoholism. 4. chronic thoracic pain, muscular. Bennett's prognosis for improvement and returning to any work was considered poor. Dr. Dixon wrote, "[Bennett] has failed treatment of his back pain including surgery. His ongoing pain is further com-

plicated by longstanding alcoholism and depression. This gives him a very poor prognosis for improvement physically or functionally." (R. 184.) From a purely physical standpoint, Dr. Dixon felt Bennett could handle sedentary/light level work with breaks as needed. He limited Bennett to carrying, lifting, pushing and pulling no more than 20 pounds on an occasional basis, standing and walking for a period of "2 to less than 6 hours" out of an 8–hour workday, and sitting for less than 6 hours in an 8–hour day with the opportunity to change positions at least every 20 to 30 minutes. (R. 184, 186–87.) In addition, Dr. Dixon opined that Bennett could not crawl and needed to limit his overhead and forward reaching, especially with weighted objects. (R. 186–87.)

Bennett's residual functional capacity was also evaluated by a non-examining state agency physician in December of 1995. (R. 112–19.) The reviewing physician opined that Bennett could occasionally lift, carry, push and pull up to 20 pounds, frequently handle up to 10 pounds, stand and/or walk for 6 hours out of an 8–hour workday, and sit for up to 6 hours in an 8–hour day (even without alternating positions). The physician further opined that Bennett could engage in occasional posturing and had no manipulative restrictions or other limitations with regard to his ability to reach. (Id.)

Meanwhile, Bennett continued to treat with Dr. Macielak through 1996 with persistent complaints of lower and upper back pain. On November 22, 1996, Bennett underwent a CT scan of the thoracic spine which was interpreted as normal but which, in retrospect, could be interpreted as revealing a small herniation on the left at T5–6. (R. 403, 523, 548.) The following month, Dr. Macielak ordered a thoracic muscle biopsy, which revealed a mild neurogenic component affecting Bennett's muscle tissue. (R. 390, 395, 549–50.) While the study showed no inflammation to the musculature, it did suggest some abnormal nerve conduction to that area. (Id.) A thoracic myelography with CT scanning was performed on January 20, 1997, indicating a left paracentral and medial foraminal disc herniation at T5–6, causing mild impingement on the spinal cord and thecal sac. (R. 391–92, 515–16.)

In light of these studies, Dr. Macielak recommended that Bennett see a thoracic specialist in either Pittsburgh or Cleveland for possible surgery. (R. 387, 390.) Dr. Macielak acknowledged that there was a risk of spinal cord damage associated with such surgery; however, he felt that the severity and frequency of Bennett's symptoms warranted the risk. Dr. Macielak noted that Bennett was symptomatic on a daily basis, that his pain was proportional to his activity level, and that he had difficulty sleeping and performing activities that require forward reaching (e.g., washing dishes). (Id.) Despite Dr. Macielak's recommendation for further surgery, there is no indication in the record that Bennett has undergone the procedure, evidently because of transportation issues and because of his on-going dispute with his former company's worker's compensation insurance carrier concerning payment for the procedure.

In October of 1997, Plaintiff's case was evaluated by Jay Newberg, M.D., a non-examining state agency physician. (R. 460–67.) In his residual functional capabilities review form, Dr. Newberg essentially approved Plaintiff for light level work. He felt that Plaintiff could occasionally lift, carry, push and/or pull up to 20 pounds, could frequently handle up to 10 pounds, could stand and/or walk for 6 hours out of an 8–hour workday, and could sit for up to 6 hours in an 8–hour day without the need for alternating positions. Aside from lim-

iting Bennett to occasional posturing, Dr. Newberg placed no restrictions on Bennett's manipulative functioning, including his ability to reach in all directions. (*Id.*)

Throughout late 1997 and 1998, Bennett continued to complain of severe symptoms in his upper and lower back. In November of 1997, Dr. Macielak reported that Bennet was experiencing more intense and frequent thoracic spasms which would "lay him out" from 4 to 7 days at a time. (R. 525.) Plaintiff still complained of low back pain radiating into his right leg, and claimed that he was virtually never pain free. He had reduced his exercise level because of his symptoms and financially was in dire straits, having lost his house, his car and most of his income. (*Id.*) Bennett returned to Dr. Macielak in May of 1998 with continued complaints of thoracic and lumbar pain, now radiating to the left side. (R. 517, 525.) He was continuing to exercise at the YMCA, despite his symptoms, and was experiencing sleep disturbances. On examination, he moved quite stiffly and exhibited some tenderness in his back. Straight-leg-raise testing was positive for leg pain on the left side but negative on the right and in cross-position. (*Id.*) On October 28, 1998, Dr. Macielak recorded Bennett's complaints of radiating pain into his left chest area with continued radiation of his lower back pain into the left leg. (R. 518, 567.) Although Bennett had shown some improvement in his exercise program, his symptoms had been aggravated by a recent change in the weather and he was again experiencing significant sleep disturbances. Although he was attempting to do light level tasks in spite of his pain, his symptoms continued to increase proportional to his activity level. Dr. Macielak felt there was little that could be done for Plaintiff in light of his on-going worker's compensation issues; therefore Bennett was simply continued on Talwin NX and Flexeril. (*Id.*)

Bennett was consultatively examined by Curtis Helgert, D.O. in April of 1998, at which time Bennett reported daily pain in his low back and between his shoulder blades along with right leg pain radiating to the foot, some tingling and numbness, and occasional paresthesias in his left hand. (R. 457–59.) His back pain increased when reaching forward. Bennett advised Dr. Helgert that he could walk a mile and, in fact, could do most anything he wanted to; however, the more activity he undertook, the more pain he would experience. He was having difficulty completing activities of daily living because of his pain. Plaintiff reported that, although he could perform the tasks, he felt miserable from pain as a result. On examination, Dr. Helgert noted the presence of a small umbilical hernia and some generalized hyperflexia. There was no evidence of atrophy in Bennett's extremities and no neurological changes in the upper or lower extremities, aside from some reported numbness in Bennett's left leg, which Dr. Helgert found interesting, considering that Bennett had complained mostly of right leg pain. Lumber flexion was limited to 80 degrees, and his low back showed some palpatory changes consistent with his surgery. However, Bennett did not exhibit much in the way of muscle spasms and Dr. Helgert did not appreciate much in the way of palpatory changes or discomfort in the upper back. Bennett displayed a normal gait, could walk forward and backward on his toes and heels, and exhibited no loss of motor power. Dr. Helgert's impression was chronic back pain. He noted that, based on Bennett's own subjective information, Bennett basically could perform no activity; however, Dr. Helgert's objective findings were rather limited. Dr. Helgert did note the results of Bennett's thoracic muscle biopsy, which suggested to

him the presence of a chronic muscle problem without any specific or clear diagnosis. Further, Dr. Helgert observed that Bennett's subjective complaints were borne out consistently in Dr. Macielak's office notes. (*Id.*)

In connection with his worker's compensation case, Bennett underwent an independent medical examination by Francis T. Ferraro, M.D. on July 27, 1998. (R. 519–24.) During the exam, Bennett appeared to be relatively comfortable. He displayed no tenderness and had a full range of motion in the lumber spine, although forward flexion caused some low back pain. Dr. Ferraro observed some tenderness in Bennett's thoracic spine with pain upon lateral flexion. In the supine position, straight-leg-raise testing caused pulling of Bennett's hamstring at 70 degrees but was negative bilaterally from seated position. Strength was normal in both lower extremities, and Bennett evidenced a normal gait with no difficulty heel or toe walking. Dr. Ferraro noted hyperesthesia to pinprick along the right side of the thoracic spine. Sensation was intact to pinprick in both legs. Bennett's deep tendon reflexes were 2+ and symmetrical in both knees and ankles, and Babinski responses were flexor bilaterally. (*Id.*) In sum, Dr. Ferraro found no objective evidence of radiculopathy and felt that Bennett had most likely reached his maximum medical improvement with respect to his lower back symptoms. With regard to Bennett's complaints of thoracic pain, Dr. Ferraro felt this was more muscular in character; he did not feel the small herniation at T5–6 could explain Bennett's symptoms, nor did he feel that surgery would be beneficial. Instead, Dr. Ferraro recommended that Bennett try to remain as active as possible and undergo some type of chronic pain program to help him learn to live with his symptoms. Dr. Ferraro felt that Bennett would be capable of sedentary-to-light activity, but recommended that Bennett undergo a formal functional capacity evaluation to determine his full functional capabilities. (*Id.*) Dr. Ferraro also noted that Bennett's depression, which predated his back problems, was "most likely . . . a major factor in his inability to return to work." (R. 523.)

Included in the record is Dr. Macielak's deposition of November 5, 1998, taken in connection with Bennett's worker's compensation claim. (R. 529–89.) Dr. Macielak's diagnosis with respect to Bennett's lower back problems was "residual radiculopathy, right lower extremity post-discectomy times two and lumbar myofascial syndrome." (R. 540–41, 578.) As for Bennett's thoracic complaints, Dr. Macielak diagnosed disc herniation at T5–6 and chronic myofascial problems. (R. 558, 578.) Although Dr. Macielak felt that Bennett's lumbar injury limited him to sedentary type work, he opined that the combination of Bennett's lumbar injury and thoracic symptoms—which were now his primary complaint—rendered Bennett incapable of sustaining any gainful employment. (R. 540–41, 561–62.) As for Bennett's thoracic impairment, Dr. Macielak felt that surgery was Bennett's only other treatment option aside from his current treatment regimen of exercises and medication. (R. 551–53.) The surgery had been recommended in 1997 but never undertaken, partly because of on-going disputes in Bennett's worker's compensation case. (*Id.*) Dr. Macielak disagreed with Dr. Ferraro's opinion that the T5–6 herniation was neither the source of Plaintiff's pain nor susceptible to successful surgery. (R. 555–56.) According to Dr. Macielak, a symptomatic thoracic disc would result in either myelopathic findings consistent with compression of the spinal cord or radiculopathic pain (i.e., thoracic pain radiating into the chest wall area). While there had

been no myelopathic findings in Bennett's case, it was Dr. Macielak's view that Bennett had indeed complained of radiculopathic pain into the chest wall. (R. 555–57.) Dr. Macielak felt that, absent corrective surgery, Bennett would remain symptomatic for the long term, and possibly permanently. He felt that Bennett's thoracic muscles would continue to atrophy and that nothing short of surgery could possibly eliminate his pain. (R. 557–58.)

On December 13, 1998, Dr. Macielak authored a summary of Bennett's treatment history, which recounted his past efforts at both conservative therapy and surgery. (R. 490–91.) At the time of the report, Bennett was still complaining of thoracic and lumbar discomfort on a daily basis. His pain, although essentially restricted to the spinal area, was aggravated by physical activity and was proportional thereto. Examination was consistent with increased paraspinal pain in the left thoracic region and associated muscle spasm. Dr. Macielak observed evidence of sciatic irritability in the right leg; however, Bennett showed no manual motor deficits or dermatomal sensory losses and his reflexes were symmetrical. Dr. Macielak's final diagnoses were: "1. Lumbar discectomy L4–5, failed. 2. Revision lumbar discectomy and decompression, successful. 3. Thoracic disc herniation T5–6, symptomatic. 4. Chronic pain syndrome." (*Id.*)

Dr. Macielak still believed that Bennett had a surgical option with respect to his thoracic spine that would hopefully reduce his pain. On the other hand, he felt Bennett's lumbar spine was permanently impaired. In the event of further lumbar deterioration, Bennett might be a candidate for a discogram and possibly lumbar interbody fusion. Dr. Macielak felt that Bennett could not perform substantial gainful work due to his "longstanding, i.e. permanent" condition. (*Id.*) In his at-

tached Physical Capacities Evaluation Dr. Macielak opined that, in an 8–hour workday, Bennett could sit for no more than thirty minutes at one time and no more than two hours total, stand for no more than 15 minutes at a time and no more than two hours total, and walk for no more than 15 minutes at a time and no more than two hours total. (R. 492–93.) Dr. Macielak restricted Bennett to lifting no more than 20 pounds occasionally and further restricted him from repetitive reaching, pushing or pulling with his hands and arms and repetitive operation of foot or leg controls with his right foot. Finally, he recommended that Bennett avoid unprotected heights and more than occasional exposure to moving machinery, noise, vibration, and temperature extremes. (R. 492–93.)

### B. *Bennett's Mental Impairments*

The record also includes a substantial amount of information pertaining to Bennett's on-going struggles with depression. In June of 1994, Bennett was hospitalized at the Meadville Medical Center for a self-induced Percocet and alcohol overdose which resulted in a coma and required intubation. (R. 145–46.) He was diagnosed with major depression, recurrent, without psychotic features; his Global Assessment of Functioning (GAF) was 55. (R. 178–79.) He was discharged after refusing inpatient treatment in the mental health unit. (R. 145–56.) He was followed by Gregory Richards, M.D. through the outpatient mental health clinic and started on Effexor and Ativan as needed. (R. 145–46, 178–79.)

Four months later Bennett again presented to the Meadville Medical Center intoxicated and threatening to shoot himself. (R. 147–50) He was tearful and distraught. His initial GAF was 30. He was noted to have a history of intermittent

alcohol usage with increased impulsivity and suicidal ideation when intoxicated as well as difficulty with his temper, especially when drinking. He had experienced increased depression over time as an outgrowth of his chronic back pain, which in turn had led to an increase in his drinking; however, his more immediate stressor was his relationship with his girlfriend. He was increased on Effexor during his hospital stay, which gradually resolved most of his depressive symptoms. An increased dose of Ativan was also administered for his anxiety. He was discharged on October 4, 1994 with a diagnosis of major depression, recurrent, and a GAF of 50. (Id.)

Following his discharge, Bennett was seen periodically by Dr. Richards and an individual therapist. (R. 178–80.) On October 21, 1995, Dr. Richards reported that Bennett had become despondent and depressed over the lack of progress with his back problems. He had lost his job and his apartment and was financially destitute. Bennett had been attending an anger management group and was still exhibiting some shortness of temper at his last evaluation. He was still experiencing intermittent suicidal ideations, and his affect was anxious and somewhat blunted. However, Dr. Richards reported that Bennett's insight and judgment, activities of daily living, concentration, and task persistence were all normal. His social functioning was likewise normal, except that he sometimes exhibited difficulty interacting with co-workers, peers and the public as a result of his anger management problems. In addition, Bennett had some difficulty adapting to stressful circumstances due to anxiety, although perhaps more as a result of his physical symptoms. (Id.) A followup report by Dr. Richards in May of 1996 indicates that Bennett was still suffering from depressive symptoms. He had stopped taking Ativan due to the loss of

his medical card but was started on Buspar for his anxiety. Dr. Richards again noted Bennett's impaired ability to interact appropriately with others and to adapt to stressful circumstances. (R. 363–64.) In August of 1996, Dr. Richards reported that Bennett continued to suffer from depression; his social situation and mental status essentially remaining unchanged. His GAF at the time was 60. (Id.) He continued to experience some difficulties interacting with others and adapting to stress due to his anger control issues and anxiety. (Id.)

Bennett was consultatively examined by Michael Mercatoris, Ph.D on July 23, 1996. (R. 438–43.) At that time, Bennett was taking Talwin and Flexeril for his back problems, but had reportedly taken himself off of Effexor and Ativan. He was still occasionally drinking and was destitute and homeless. He was experiencing suicidal thoughts regularly, a lack of sex drive, poor sleep, and crying spells. On examination, Dr. Mercatoris found Bennett's affect to be depressed but "full range" and "appropriate." His stream-of-thought consciousness was fluid, comprehensible and goal-directed. His abstract thinking was fair, he was oriented, and he could partially count back in serial 3's. His remote memory was fairly intact, but his recent and past memories showed some deficits. Dr. Mercatoris felt that Bennett had limited social judgment and some impulse control problems related to his anger. In terms of daily activities, Bennett reported being able to clean, shop and cook, take public transportation and pay bills. Bennett also claimed that concentration and task persistence would not be a problem in terms of performing his past work, were it not for his back problems. Socially, he was limited in his contacts. Dr. Mercatoris noted that Bennett lacked the ability to make independent decisions

and usually would lose his temper when facing conflict in the work-place. Dr. Mercatoris diagnosed major depression, recurrent, with possible underlying dysthymia and a rather chronic and severe alcohol dependence. He felt that Bennett's prognosis was "guarded at best." (*Id.*)

In August of 1996, Bennett was again hospitalized for suicidal ideation with intent to follow through. (R. 373–77.) Although Bennett's substance addiction did not appear to be a factor in this episode, Bennett expressed difficulty coping with his life. He was experiencing financial stress and was living without any hot water. He had lost his medical card and therefore canceled an operation that had been planned for his umbilical hernia. A lack of transportation had reportedly prevented him from pursuing educational advancement through the Office of Vocational Rehabilitation and was keeping him socially isolated. He was continuing to experience depression because of his continuing back problems and felt that his life was hopeless. On the day following his admission, he was extremely depressed and tearful, but showed no evidence of active psychotic symptomotology. He was alert and oriented, his insight and judgment were normal, and his affect was appropriate. His concentration was normal and long-term and short-term memories were intact. His overall Global Assessment of Functioning was 45. Bennett was started on Buspar and Effexor and also participated in group therapy. His diagnosis upon discharge was major depression, recurrent, without psychotic features and alcohol abuse in current remission. His GAF was 55. He was scheduled for out-patient follow-up by Dr. Richards. (*Id.*)

In June of 1997, Bennett was referred by the Office of Vocational Rehabilitation to Vincent DiMichele, M.A., for the purpose of undergoing a comprehensive vocational assessment evaluation. (R. 506–13.) Included in Mr. DiMichele's report is a "Summary of Temperament," which indicates that it would be "difficult, if not impossible," for Bennett to be "outgoing"; he would be unlikely to succeed in any job requiring salesmanship, social skills or public relations. Bennett's prognosis for vocational adjustment in this area was considered very poor. Mr. DiMichele felt that Bennett probably experiences frequent changes of mood and emotional instability and would likely have problems in all aspects of his daily life, including work and personal relationships. Mr. DiMichele felt Bennett was unlikely to succeed in any job requiring emotional stability, self-confidence, or the ability to work under pressure. It was thought that Bennett would act rather defensively when criticized. In terms of Bennett's cooperation level, it was felt that he may have difficulty getting along well with others, may be difficult to please, would probably be critical and intolerant of others at times. Mr. DiMichele recommended a slower paced and/or single task type of work environment for Bennett. He felt that Bennett was best suited for structure and detail. Although Mr. DiMichele thought Bennett was not emotionally stable enough to make vocational decisions, he noted Bennett's superior capacity for learning new tasks and his strong technical skills. (*Id.*)

Throughout the remainder of 1997 Bennett underwent drug and alcohol counseling through the Office of Vocational Rehabilitation (R. 308–11) and also saw J. Alexander Dale, Ph.D, a health psychologist, for evaluation of his substance abuse problems, depression and chronic discomfort. (R. 468.) In September of 1997 Bennett completed a psychiatric activities assessment form for Dr. Dale. (R. 477–80.) In terms of activities of daily living, Bennett indicated he usually puts off

shopping and often goes hungry. He admitted that personal grooming and hygiene were "ok" and that he could do some laundry. He used his worker's compensation benefits to pay his bills and denied using public transportation, except to go to the mall. In terms of cleaning, he indicated, "I am the only person there." (R. 477.) Bennett reported that, socially, he was basically a loner and had no ability to initiate social contacts and no interest in group activities. His social maturity was self-reported as "ok" and his communication was "good," but he did not get along with persons in positions of authority, did not tend to associate with peers, and had difficulty remembering people. (R. 478.) With respect to concentration and task persistence, Bennett indicated that he has not had to carry out instructions for several years. He felt that he could not perform within a schedule because of his erratic sleep schedule and reported occasional problems attending to tasks. He could not sustain a routine or work consistently at anything while at home. (R. 479.) In terms of his ability to adapt to changes, Bennett indicated "I haven't had any really good changes—depends on the change." (R. 480.) He reported usually being on time for deadlines or schedules, but felt he could not maintain regular attendance and expressed a tendency to avoid conflict. (*Id.*)

Dr. Dale evaluated Bennett again on October 19, 1997. (R. 468–69, 471–76.) At that time Bennett was evidently refusing his depressive medication because of many side effects and was drinking to help ease his physical pain. He was planning to continue with his therapy, however. Dr. Dale found Bennett's thought process to be somewhat limited but adequately continuous. He seemed to be preoccupied with his pain and felt like he was constantly suffering. During his examination he

was oriented and able to do serial 7's backwards. In terms of social judgment, Plaintiff acknowledged that he was not good with people. Dr. Dale diagnosed major affective depression, chronic pain disorder and mixed personality disorder with borderline characteristics. He felt that Bennett's prognosis was fairly poor due to his projection of his problems on to other people. (471–76.) Though Bennett had initially been somewhat resistant to changing his behaviors, by December of 1997 he had indicated a willingness to abstain from alcohol and to experiment with other lifestyle changes to affect his mood. (R. 470.)

Dr. Dale's last report of record is dated June 26, 1998. (R. 468–69.) As of that date, Bennett had reportedly been abstinent from alcohol some seven months but was still sleeping and eating poorly. He had enrolled in a computer typing class at a vo-tech school and had shown an interest in defining the nature of his long-time learning disability. Dr. Dale noted that Bennett had improved significantly over the previous nine months of therapy: he was abstaining from the use of alcohol, had increased his activity level, was exercising, and was self-training on the computer. However, his verbal behavior was still thought to be very argumentative and negative. Dr. Dale diagnosed chronic pain disorder, major depressive disorder, psychoactive substance dependence (alcohol—in remission), and borderline personality disorder. (*Id.*)

Bennett was again referred consultatively to Dr. Mercatoris in February of 1998. (R. 431–37.) On examination, Bennett's affect was depressed but full range and appropriate. He was still experiencing poor sleep and suppressed appetite, along with increased crying spells and weekly suicidal thoughts. His verbal expression was fluent, comprehensible and goal-directed. He seemed preoccupied

with his back pain, which he related was near constant. Dr. Mercatoris noted Bennett's difficulty subtracting serial 3's; however, Bennett's abstract thinking was fair, he was oriented, and his memories were intact. He was still experiencing temper problems and his social judgment was impaired when drinking. Dr. Mercatoris diagnosed major depression, recurrent, alcohol dependency in short remission, possible mixed personality disorder, and chronic pain syndrome. Bennett's diagnosis was "obviously quite guarded." With regard to activities of daily living, Bennett indicated he can clean, drive, use public transportation, pay bills, and attend to his hygiene. He occasionally cooked but expressed difficulty carrying groceries. Bennett generally avoided social situations and showed no interest in group activities. He reportedly got along with his prior bosses "sometimes" and at other times "not so good." He claimed to get along with co-workers "as long as they do what they are supposed to do," but admitted that he did not like talking to people and did not get along very well with the public. In terms of adapting to stressful circumstances, Bennett admitted to getting overwhelmed and getting in "panic stages" where he feels paranoid and doesn't know what to do. (*Id.*)

In the summer of 1998, Bennett underwent a psychological evaluation by Martin Meyer, Ph.D. and Julie Uran, Ph.D. of Vocational and Psychological Services, Inc. (R. 496–505.) Bennett was noted to be preoccupied with his learning deficiencies and described himself as a failure. He showed tendencies toward depression, anxiety, rumination, suspicion of others, social discomfort, and historically had resorted to negative behaviors when overwhelmed. It was thought that Bennett would benefit from self-esteem building, positive vocational accomplishment, and continued therapeutic intervention. Cognitively, Bennett

was essentially functioning normally. His perceptual motor skills and language functions were normal. His ability for sustained concentration was mildly impaired. He was found to be learning disabled in the areas of reading and spelling, and was mildly impaired with regard to attention skills. He was thought to possess low-average to below-average intellect and needed to avoid strenuous job placements. Functionally, it was felt that Bennett's poor self-esteem would impact negatively on his general presentation and performance. He would experience difficulties learning in a traditional environment without support systems. He had difficulties with oral recall and attentional processes; his mobility was limited and he exhibited affective instability. Drs. Meyer and Uran felt that Bennett needed on-the-job or short-term training or skilled vocational training. They recommended an environment that would provide modeling of required tasks, multiple repetitions, vocational supervision, structure, elimination of extraneous distractions, sitting and standing as needed, avoidance of strenuous physical activity, a multi-sensory approach to learning, self-esteem building, and counseling services. It was further recommended that Bennett avoid vocational placements that would require extensive social interactions. Drs. Meyer and Uran recommended vocational domains in skilled science (e.g. food testing) or skilled technology (such as electronics assembly or small appliance repair). Bennett's Axis 1 diagnosis was reading disorder, spelling disorder, alcohol dependence, major depression (recurrent), and anxiety disorder, not otherwise specified. Drs. Meyers and Uran noted significant vocational, financial, self-esteem, interpersonal, and learning stressors, and assessed Bennett's GAF at 60.

Also included in the record is a Psychological Review Technique Form/ Rating of Impairment Severity completed by Roger L. Glover, Ph.D in October of 1997. (R. 444–55.) In this report, Dr. Glover (a non-examining psychologist) opined that Bennett has a severe affective disorder in the form of his depressive syndrome, which is characterized by psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty. concentrating or thinking. (R. 447.) Functionally, Dr. Glover assessed Bennett as only slightly restricted in his activities of daily living and maintaining social functioning. He opined that Bennett often experiences deficiencies of concentration, persistence or pace which result in failure to complete tasks in a timely manner and that he has experienced deterioration in a work-place setting "once or twice." (R. 451.) Dr. Glover also completed a functional capacity assessment in which he opined that Bennet was not significantly limited in terms of understanding and memory, social interaction, and adaptation skills. (R. 452–55.) With regard to the issue of sustained concentration and persistence, Dr. Glover opined that Bennett was moderately limited in his ability to do the following: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. He rated Bennett as not significantly limited with regard to his ability to carry out both short and detailed instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions. (*Id.*) Dr. Glover's assessment was summarily approved by Rayond F. Dalton, Jr., Ph.D on February 23, 1998. (R. 445, 455.)

## II. STANDARD OF REVIEW

Our review of the Commissioner's determination, insofar as it pertains to the question of substantial evidence, is highly deferential. Indeed, the findings of the Commissioner as to any fact, if supported by "substantial evidence," are conclusive. 42 U.S.C.A. § 405(g) (Lexis 1998). Substantial evidence is not a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is considered to be less than a preponderance of the evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401, 91 S.Ct. 1420; *Jesurum v. Sec'y of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir.1995). Further, we must give deference to the agency's "inferences from facts if those inferences are supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" *Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190–91 (3d Cir.1986). Nevertheless, the determination of whether substantial evidence exists is not merely a quantitative exercise. "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) (citing *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983); *Gilliland v. Heckler,* 786 F.2d 178, 183 (3d Cir.1986)). "Nor is evidence substantial if it is overwhelmed by other evidence—par-

ticularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Id.*

## III. DISCUSSION

In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services,* 841 F.2d 57, 59 (3d Cir.1988); 42 U.S.C.A. § 423(d)(1)(A) (Lexis 1999). A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C.A. § 423(d)(2)(A) (Lexis 1999).

The Social Security Administration has established a sequential evaluation process for determining whether a claimant is under a disability. *See* 20 C.F.R. § 404.1520 (1999). This process has as been summarized as follows:

> ... In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala,* 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. *See Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984).

*Plummer v. Apfel,* 186 F.3d 422, 428 (3d Cir.1999).

In this case, the ALJ reserved ruling at step one of the evaluation process, finding

that the evidence was inconclusive insofar as it related to Plaintiff's earnings for 1994. At step two, the ALJ determined that Bennett's depression, personality disorder, and alcohol abuse are not "severe" impairments in that they have no more than a *de minimis* effect on Bennett's ability to work; accordingly, he did not consider those impairments further. In contrast, the ALJ found that Bennett's back impairments impose significant restrictions on his work-related activities and are therefore considered "severe" impairments, but not ones which meet or medically equal a "listed impairment" for purposes of step three of the analysis. At step four, the ALJ assessed Bennett's residual functional capacity (RFC) and concluded that Bennett retains the ability to perform work at the light exertional level, provided that he can only occasionally engage in postural limitations such as climbing, balancing, stooping, kneeling, crouching, and crawling and is limited to performing simple, repetitive tasks. The ALJ then determined that Bennett cannot perform his past jobs as a machine operator and a punch press operator in light of his RFC. Nevertheless, the ALJ denied Bennett's claim at step five of the evaluation process, concluding that he could perform other jobs which exist in significant numbers in the national economy, including work as a sales counter worker, an unskilled cashier, and an unskilled general office clerk.

On appeal, Bennett raises two basic arguments. First, he objects that the ALJ failed to accord proper weight to the opinion of his treating physician, Dr. Macielak. Second, he contends that the Commissioner failed to meet her burden of proving at step five of the evaluation process that Bennett is capable of performing other jobs in the national economy. More specifically, Bennett claims that the hypothetical question posed to the vocational expert was critically deficient in that it failed to incorporate certain aspects of his physical and mental limitations. As a result, Bennett claims, the ALJ could not rely upon the vocational expert's testimony as substantial evidence in support of his step-five finding. We first consider Bennett's objections with respect to the ALJ's assessment of his psychological impairments, as this involves a review of the ALJ's analysis at step two of the evaluation process. In essence, we are asked to determine whether there is substantial evidence in this record to support the ALJ's finding that Bennett's psychological impairments were not "severe."

### A.

In order for a claimant to be found "disabled" for purposes of disability benefits, he must have an impairment(s) that is severe and that meets the required durational period. 20 C.F.R. § 404.1520(a) (1999). An impairment is not severe unless it significantly limits the claimant's physical or mental ability to do basic work activities. § 404.1521(a). "Basic work activities" include, e.g., understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. § 404.1521(b)(3)-(6). When determining whether a claimant's physical or mental impairments are of sufficient medical severity, the Commissioner is required to "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." § 404.1523. If a claimant does have a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. *Id.*

When the step-two determination involves evaluating a mental impairment, the Commissioner uses a special procedure to determine whether the requisite "severity" has been shown. The Commissioner first evaluates the degree of functional loss resulting from the impairment by examining four distinct domains: (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, and pace; and (iv) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3) (1999). Functional limitations in the first two domains (activities of daily living and social functioning) are rated on a five-point scale: none, slight, moderate, marked, and extreme. Limitations in the third domain (concentration, persistence, and pace) are rated according to a slightly different five-point scale: never, seldom, often, frequent, and constant. Limitations in the fourth domain (deterioration or decompensation in work or work-like settings) are rated according to a four-point scale: never, once or twice, repeated (three or more), and continual. *Id.* A mental impairment is generally considered "not severe" if the claimant's limitations in activities of daily living and social functioning are "none" or "slight," if disturbances in concentration, persistence and pace are "never" or only "seldom" occurring, and if the claimant "never" experiences deterioration or decompensation in a work-like setting. § 404.1520a(c)(1). The Commissioner generally follows this guideline, unless the evidence otherwise indicates that there is significant limitation of the claimant's mental ability to do basic work activities. *Id.*

█ In this case, the ALJ concluded that Bennett's depression, alcohol abuse, and personality disorder were not severe in that they resulted in no significant work-related limitations and would have no more than a *de minimis* effect on Bennett's ability to perform basic work activities. Bennett claims that the ALJ erred in improperly discounting and/or disregarding the impact that his psychological condition would have on his ability to sustain gainful employment. Having reviewed the entire record in some detail, the Court agrees that the ALJ's finding at step two is unsupported by substantial evidence and therefore cannot stand.

As an initial matter, the ALJ's own findings do not comport with the Commissioner's regulation pertaining to the evaluation of mental impairments at step two. The ALJ found that Bennett had (a) only "slight" limitations in activities of daily living, (b) "slight" limitations in his social functioning, (c) "seldom" suffered from deficiencies in concentration, persistence and pace, and (d) experienced deterioration or decompensation in a work-type setting only "once or twice." While the first three findings comport with the Commissioner's general criteria for a non-severe mental impairment, the last one does not. Generally, a finding that the claimant "never" experiences deterioration/decompensation is required for the Commissioner to conclude that a mental impairment is not severe. *See* 20 C.F.R. § 404.1520a(c)(1). No explanation is given in the ALJ's opinion as to why this discrepancy nevertheless justifies a finding of non-severity. In fact, this discrepancy is not even acknowledged by the ALJ.

In addition, the record as a whole does not substantially support the ALJ's determination that Bennett exhibits only "slight" limitations in his social functioning. Virtually all of Bennett's mental health care providers and vocational counselors have noted his problems in the area of social functioning. Bennett's treating physician, Dr. Richards, reported on multiple occasions that, although Bennett generally exhibits normal social functioning,

he has difficulty adapting to stress and interacting appropriately with others—particularly co-workers, peers and the public—because of his on-going anger control issues. Bennett's other mental health provider, Dr. Dale, documented Bennett's lack of social contacts, avoidance of peers, and difficulty getting along with persons of authority (especially police officers). In October of 1997, Dr. Dale gave Bennett a fairly poor overall psychological prognosis due to his tendency to project his problems onto others. While Bennett had reportedly shown significant improvement by June of 1998, Dr. Dale noted that verbally he was still very argumentative and negative. Dr. Mercatoris, who consultatively examined Bennett on two occasions, documented Bennett's limited social judgment and lack of impulse control stemming from anger management problems. These psychological evaluations reflect that Bennett has virtually no friends and no interest in group activities, generally avoids social situations, and normally loses his temper when facing conflict in the work-place. Bennett related to Dr. Mercatoris that he has gotten along with his prior bosses "sometimes" and "not so good" at other times; he would get along with co-workers only if "they do what they are supposed to do"; he does not relate well to the public and does not like talking to people. Mr. DiMichele, having conducted a thorough vocational assessment of Bennett in 1997, noted that it is "difficult, if not impossible" for Bennett to be outgoing and that he would be unlikely to succeed in any job requiring salesmanship, social skills or public relations. Mr. DiMichele felt that Bennett's prognosis for vocational readjustment in this area seemed very poor. He predicted that Bennett would probably experience problems in all aspects of his daily life, including work and personal relationships, as a result of his frequent mood changes and emotional instability.

Mr. DiMichele thought it unlikely that Bennett could succeed in any job requiring the ability to work under pressure, and he further predicted that Bennett might have difficulty accepting criticism and getting along well with others, as he could be difficult to please and intolerant of other people. Drs. Meyer and Uran consultatively examined Bennett in 1998 and documented his tendencies toward depression, rumination, suspicion of others, social discomfort, and negative behaviors when overwhelmed. They opined that, functionally, Bennett's poor self-esteem would impact negatively on his general presentation and performance. They also indicated that Bennett should avoid any vocational placements requiring extensive social interactions.

In sum, there is a lack of any substantial support in the record for the ALJ's conclusion that Bennett's limitations in social functioning are only "slight." Yet if Bennett's limitations in social functioning are more than "slight," this bespeaks a "severe" mental impairment, particularly when considered in conjunction with his prior episode(s) of decompensation in a work-like setting. *See* 20 C.F.R. § 404.1520a(c)(1) (mental impairment is generally considered "not severe" if it imposes no more than *slight* limitation in activities of daily living *and social functioning,* only seldom results in disturbances of concentration, persistence and pace, and never causes deterioration or decompensation in a work-like setting) (emphasis supplied).

The severity of Bennett's depression is further underscored by the observations of Dr. Dixon and Dr. Ferraro, both of whom consultatively examined Bennett in relation to his complaints of on-going back pain. Although Drs. Dixon and Ferraro did not treat Bennett for his depression, both physicians acknowledged that there

was a significant mental health component to Bennett's functional limitations. Dr. Dixon opined in December of 1995 that, while Bennett could perform sedentary/light work from a purely physical standpoint, his history of alcoholism and depression resulted in a poor overall prognosis for returning to work. Dr. Ferraro conducted an independent medical examination in July of 1998 and concluded that Bennett's depression was most likely a "major factor" in his inability to return to work.

In discounting Bennett's psychological impairments, the ALJ relied in part on the fact that, when hospitalized and/or under treatment for his depression, Bennett's Global Assessment of Functioning (GAF) was generally between 55 and 60, indicating only moderate symptoms. The ALJ also reasoned that Bennett's depression appeared to be well controlled by medication and infrequent therapy. (R. 19–20.) While these observations may be generally accurate, a claimant's ability to function within a structured hospital or treatment setting is not necessarily indicative of his ability to carry out basic work activities in a job setting on a regular and continuing basis. Ultimately, "[t]he relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity," *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir.2000), not whether he can generally function well on medication. *See id.* ("For a person ... who suffers from an affective or personality disorder marked by anxiety, the work environment is com-

pletely different from home or a mental health clinic. [The treating physician's] observations that [the claimant] is 'stable and well controlled with medication' during treatment does not support the medical conclusion that [the claimant] can return to work."). Furthermore, according to the *Diagnostic and Statistical Manual of Mental Disorders* (on which the ALJ relies), a GAF score of 55 to 60 suggests "moderate symptoms" or *"moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual* (DSM–IV) (4th ed) 32 (emphasis supplied). A "moderate" limitation of social functioning, under the Commissioner's regulations, would suggest a mental impairment that is "severe" in nature. *See* 20 C.F.R. § 404.1520a(c)(1).

Other aspects of the ALJ's rationale at step-two are tainted by improper speculative inferences from the medical evidence and/or inaccurate assumptions. For example, the ALJ opined that, after Bennett refrained from using alcohol, there was a "significant improvement in his outlook, and ... he began exercising and sought training for competitive work activity." (R. 19.) In essence, the ALJ made a medical judgment that, when Bennett was abstinent from alcohol, his depression "[did not] significantly interfere[ ]with his ability to function on a fairly regular basis." (R. 20.) We think this type of statement borders on improper medical speculation, especially since no health care professional of record ever expressed a similar opinion.[1]

---

1. In fact, there is evidence suggesting that Bennett's drinking may well be as much an outgrowth or symptom of his depression as a contributing cause. For example, treatment notes indicate that Bennett's drinking increased during his alleged disability period as a result of his growing depression and that Bennett sometimes used alcohol as a means

of self-medicating his depressive symptoms. (R. 64, 147–50, 470.)

Other evidence in the record suggests that Bennett continued to suffer significant depression even in the absence of alcohol use. In August of 1996, Bennett was hospitalized for suicidal ideations with intent to follow through and had a GAF of 55 upon discharge,

Even if it is accurate, however, a claimant's ability to function on a "fairly regular basis" in spite of depression does not necessarily bespeak an ability to perform competitive gainful activity on a regular and continuing basis—a requirement inherent in the ALJ's step-two finding. Elsewhere in his opinion, the ALJ cited Bennett's demeanor during the administrative hearing, his activities of daily living, and his ability to drive, launder clothes, visit with his son, exercise, and visit local taverns as evidence that Bennett's psychological condition does not significantly interfere with his ability to function on a sustained basis. To the extent the ALJ relied on these factors as evidence that Bennett is not significantly restricted in his social functioning and/or his general ability to engage in regular competitive work activities, we find the "evidence" to be both insubstantial and improperly based on the ALJ's own lay opinions.

The ALJ further justified his step-two analysis by referring to Bennett's "lack of . . . significant treatment or medication on a continuous basis" and, in particular, his disinclination to accept medication for his depression. (R. 20–21.) However, the medical records consistently reflect that Bennett's refusal of medications was the result of his having lost his medical card and his concerns about being able to pay for his medication in light of his dire financial condition. (R. 50, 363–64, 373–77, 431–37.) Bennett's discontinuation of treatment with Dr. Richards was similarly tied to the termination of his medical insurance. (R. 50). Thus, it is somewhat inaccurate for the ALJ to suggest that Bennett's lack of on-going treatment was reflective of a non-severe impairment

when financial considerations clearly played a role in his course of treatment. Bennett admittedly stopped seeing Dr. Dale in October 1998 because he felt that the sessions were not benefitting him. (R. 48.) Nevertheless, Bennett underwent no less than three hospitalizations for suicidal ideation during his alleged period of disability, treated with Dr. Richards between 1994 and 1996, attended individual and group counseling, and treated with Dr. Dale on more than a dozen occasions between 1997 and 1998. A fair reading of the record as a whole does not substantially support the ALJ's assertion that there has been a lack of any significant treatment for Bennett's depressive symptoms.

Finally, we note that the ALJ failed at step-two to consider the severity of Bennett's physical and mental impairments in combination. Instead, the ALJ initially determined that the mental impairments in and of themselves were not "severe," then set this evidence aside without further discussion while continuing to evaluate only Bennett's physical ailments. This approach was contrary to the Commissioner's regulation which requires the ALJ to consider whether the combined effects of all the claimant's impairments, mental and physical, meet the "severity" test. *See* 20 C.F.R. § 404.1523 (1999). *See also Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir.2000) (citing cases).

For all of the foregoing reasons, we conclude that the ALJ's determination as to the non-severity of Bennett's mental impairments at step-two of the evaluation process was marred by legal error and otherwise unsupported by substantial evidence in the record as a whole. Because

---

though drugs and alcohol were not a factor in this episode. (R. 373–77.) And, even while Bennett was reportedly abstinent from alcohol, he was still experiencing frequent crying spells and suicidal thoughts, still tended to get

overwhelmed by stress, and was still argumentative, negative, and reluctant to socialize, as reflected in the reports of Dr. Mercatoris (R. 431–37) and Dr. Dale (R. 468–69).

Bennett's severe mental impairments were not incorporated into the ALJ's hypothetical question or otherwise considered by the vocational expert, the ALJ could not rely on the VE's testimony as substantial evidence in support of his denial of benefits. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir.1987); *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984).[2] The Commissioner's final decision must therefore be vacated for further proceedings on this basis.

### B.

■ Bennett also objects to the ALJ's hypothetical on the basis that it fails to include important limitations relative to his back impairments as reported by his treating orthopedic surgeon, Dr. Macielak, whose opinion—Bennett contends—should have been given significant, if not controlling, weight. Dr. Macielak expressly opined that Bennett's thoracic and lumbar impairments in combination prevented him from engaging in competitive gainful employment. Functionally, Dr. Macielak restricted Bennett to sitting, standing and walking no more than two hours each in an 8-hour work day, and then only with intermittent breaks every 15 to 30 minutes. In addition, Dr. Macielak opined that Bennett should refrain from repetitive reaching, pushing or pulling with the upper extremities or right lower extremity. In light of these restrictions, Bennett argues, the ALJ lacked substantial evidence to support his finding that Bennett could engage in the light duty jobs enumerated by the vocational expert.

"Light work," as defined by the Commissioner

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b) (1999). The "frequent" lifting and carrying of objects, which is a central requirement of light work, is defined under the Commissioner's rulings as occurring from one-third to two-thirds of the time. *See* SSR 83–10 (1983). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8–hour workday." *Id.* Furthermore, the Commissioner's definition of "substantial gainful activity" assumes a claimant's ability to engage in sustained activity for an 8 hour period each working day. *See* SSR 96–8p (July 2, 1996) (RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities on a "regular and continuing basis,"—i.e. 8 hours per day, 5 days per week, or an equivalent work schedule.).

Bennett contends that the restrictions imposed by Dr. Macielak (a) should have been credited by the ALJ and (b) preclude him from performing not only the jobs cited by the vocational expert but, indeed, any job. He points out that Dr. Macielak's restriction on repetitive reaching ruled out

---

**2.** The Court observes that the ALJ, "affording the claimant every benefit of a doubt," assumed that Bennett could perform only simple and routine work and incorporated this restriction into his hypothetical question. (R. 24.) Nevertheless, we cannot say that this additional restriction necessarily accommo-

dates all relevant limitations potentially presented by Bennett's mental impairments, especially his difficulties in the area of social functioning. Because it is inherently factual, this issue is better addressed on remand to the Commissioner.

essentially all of the unskilled jobs for sales counter worker or cashier positions and about one-half of the unskilled general office clerk jobs. (*See* R. 72–74.) Bennett also argues that, because Dr. Macielak generally prohibited him from doing any repetitive pushing or pulling, he could not perform the category of light duty jobs that involve "mostly sitting with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Nor, Bennett maintains, could he perform the "frequent" lifting and/or carrying of objects, which would require him to walk and/or stand for up to six hours in a typical work day. Finally, Bennett contends, he could not maintain a regular 8–hour daily work schedule because Dr. Macielak limited him to no more than six hours of collective standing, walking and sitting in an 8–hour period.

■ Bennett maintains that Dr. Macielak's opinion of disability and residual functional capacity evaluation were arguably entitled to controlling weight, or at least significant weight, in light of the entire record here. It is well established that the medical judgment of a treating physician can be rejected, but only on the basis of contradictory medical evidence. *See Jones v. Sullivan,* 954 F.2d 125, 128–29 (3d Cir.1991); *Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir.1988). Here, the ALJ gave less weight to Dr. Macielak's opinion on the ground that "the limitations assessed by Dr. Macielak are not supported by the [medical] findings and the activities reported by the claimant in the record when considered in its entirety." (R. 23.) While the ALJ's discussion was not extremely lengthy, it is clear from a review of his decision that he considered and relied to varying degrees upon the reports of Drs. Concilus, Dixon, Ferraro, and Helgert, as well as the opinions of the

non-examining state agency physicians, statements reportedly made by Bennett himself about his own capabilities, and certain findings contained in Dr. Macielak's report of December 13, 1998.

Having carefully evaluated the ALJ's explanation for his assessment of the medical evidence, we do not agree that the ALJ erred in declining to credit all of the medical limitations imposed by Dr. Macielak. To the extent Dr. Macielak opined that Bennett is totally disabled, the ALJ correctly concluded that whether a person meets the definition of "disabled" under the Social Security Act is a legal issue reserved to the Commissioner alone. *See* 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

Moreover, Dr. Macielak's opinion that Bennett could not sustain work activity for 8 hours in a typical workday was contradicted by other medical evidence in the record. Dr. Dixon opined that, at least from a physical standpoint, Bennett could engage in "sedentary/light" work activity. His assessment that Bennett could intermittently sit for less than 6 hours during a workday and also stand and/or walk for a period of "2 to less than 6 hours" in a workday is somewhat ambiguous but, in light of his recommendation for sedentary/light work, it suggests that Dr. Dixon felt Bennett physically could endure an 8–hour workday. Dr. Ferraro also suggested that Bennett could engage in "sedentary-to-light type work duty," although he recommended that Bennett undergo a formal work capacity evaluation to define his functional limitations more completely. Additionally, two reviewing state agency physicians assessed Bennett as capable of performing light duty work.[3] The ALJ

---

**3.** Plaintiff posits that "[n]o physician rendering an opinion as to Bennett's capabilities had

also relied on medical findings documenting Bennett's lack of atrophy or neurologic changes in the upper and lower extremities, lumbar flexion to 80 degrees, apparently normal gait, normal motor power, and ability to heel and toe walk. The Court is satisfied that the reports and opinions relied upon by the ALJ collectively provided a substantial basis for declining to adopt Dr. Macielak's opinion of disability.

Nor did the ALJ commit reversible error in failing to incorporate into his hypothetical question Dr. Macielak's restriction on repetitive reaching. First, there is medical evidence in the record which arguably contradicts Dr. Macielak's opinion in this regard. Dr. Ferraro disputed the significance of Bennett's thoracic disc herniation in the sense that he did not think it was symptomatic, nor did he recommend surgery for this condition. Though he apparently acknowledged some thoracic impairment, Dr. Ferraro viewed it as primarily muscular in nature and generally opined that Bennett could undertake sedentary-to-light work. He recommended that Bennett undergo further pain management therapy in order to learn to live with his symptoms and remain useful in society. Perhaps more significantly, however, Bennett's attorney had the opportunity to posit this limitation to the vocational expert. Assuming that Bennett could not, in fact, engage in repetitive reaching, the expert nevertheless opined that Bennett could perform "about half" of the general office clerk jobs previously identified for the ALJ—or about 187,500 nation-

ally. (R. 72–74.) This is satisfactory to establish the existence of a significant number of jobs in the national economy. *See, e.g., Craigie v. Bowen,* 835 F.2d 56, 58 (3d Cir.1987) (vocational expert's opinion that claimant could perform approximately 200 light duty jobs within his region provided a clear indication that there existed in the national economy other substantial gainful work which the claimant could perform).

Similarly, we see no basis for reversible error in the ALJ's refusal to credit Dr. Macielak finding that Bennett could not engage in repetitive pushing or pulling of the upper extremities or the right lower extremity. As the vocational expert acknowledged, the concept of "repetitive" pushing or pulling means "almost constant." (R. 73.) Bennett argues that this limitation is inconsistent with the ALJ's hypothetical, which assumed Bennett had the ability to perform the full range (or at least a wide range) of light work. By definition, light duty jobs include those that involve sitting most of the time with *some* pushing and pulling of arm or leg controls. The jobs outlined by the vocational expert do not appear to involve this type of activity[4] but, regardless, light exertional jobs by definition do not involve "repetitive"—i.e. "almost constant"—pushing or pulling of controls; as noted, they involve only "some" pushing or pulling. Thus, we are not persuaded that Dr. Macielak's restriction on repetitive pushing or pulling facially conflicts with the ALJ's finding that Bennett can perform the limited light duty jobs of sales counter worker,

the advantage of the diagnostic studies of Bennett's thoracic condition which revealed the source of Bennett's intrascapular pain and resulting upper extremity dysfunction." (Pl.'s Br. at 16.) However it does appear that Dr. Newberg, one of the state agency review physicians, did have the benefit of the thoracic myelography and CT scan conducted in January 1997. (R. 461.) It also appears that

Dr. Ferraro had the benefit of this study, and Dr. Helgert was at least privy to Bennett's thoracic muscle biopsy study. (R. 457–59, 519–24.)

4. "Relatively few unskilled light jobs are performed in the seated position." *See* SSR 83–10 (1983) ("Glossary").

unskilled cashier, or unskilled general office clerk.[5] In any event, however, the ALJ was not required to accept Dr. Macielak's restriction on pushing and pulling, as there was other competent medical evidence of record in contradiction to that finding. We have already discussed Dr. Ferraro's opinion, which disputed the significance of Bennett's herniated thoracic disc and the need for further surgery. In addition, however, Dr. Dixon evaluated Bennett in December of 1995 and opined that Bennett required no restrictions on pushing or pulling of hand or foot controls other than a weight limit of pushing/pulling no more than 20 pounds occasionally and 10 pounds frequently. Accordingly, the ALJ was not required to accept Dr. Macielak's absolute restriction on repetitive pushing and pulling.

 Nevertheless, the Court agrees with Bennett that the ALJ's hypothetical was deficient in one respect: to wit, there was insufficient evidence to support the ALJ's implicit finding that Bennett can walk and/or stand for a period of 6 hours out of an 8–hour day, even in the absence of a sit-stand option. The only medical opinions of record which support this determination are those of the non-examining state agency physicians which, we conclude, do not amount to "substantial evidence" under the circumstances here. It is well established that the determination as to whether or not substantial evidence exists is not merely a "quantitative exercise":

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence—par-

ticularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Morales,* 225 F.3d at 317 (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983); *Gilliland v. Heckler,* 786 F.2d 178, 183 (3d Cir.1986)). Here, the ALJ's implicit assumption that Bennett could walk/stand for up to six hours was contradicted not only by Dr. Macielak's opinion, but also by that of Dr. Dixon who limited Bennett to standing/walking less than six hours with breaks as needed. According to the ALJ, Bennett supposedly represented to Dr. Dixon that he had the "unlimited ability to walk." (R. 22) This assertion is inaccurate, however; Dr. Dixon's report actually indicates that Bennett merely indicated "casual walking is not bad." Such a representation hardly equates to an ability to stand and/or walk continuously for up to six hours in a work day. Although Dr. Ferraro opined that Bennett could perform "sedentary-to-light type duty," he did not express any opinion as to whether Bennett could meet the durational requirement of standing/walking for six hours, which is required in order to perform a wide-range of light duty jobs. Instead, Dr. Ferraro recommended that Bennett undergo a formal functional capacity evaluation to determine his full range of capabilities. Drs. Helgert and Concilus examined and treated Plaintiff, respectively, but did not formally opine as to his physical capabilities. Notably, the ALJ cited Dr. Helgert's treatment records for the proposition that Bennett reported being able to walk a mile and could do "almost anything" (R. 22); however, it appears the ALJ took this statement out of context. While Bennett professed being able to do

---

5. To the extent repetitive pushing or pulling involves the same type of activity as repetitive reaching, the vocational expert's testimony establishes that Bennett can perform about 187,500 jobs nationally as an unskilled general office clerk. As we have discussed, *supra,* this constitutes a substantial number of jobs in the national economy.

"most anything he wants to," he related that the more activity he undertakes, the more pain he suffers. (R. 457.) In fact, Bennett told Dr. Helgert that he had difficulty completing his activities of daily living from a pain control standpoint: "He can actually do the things, it is just that he is completely miserable in performing them." (R. 459.) In arriving at his RFC determination, the ALJ also relied on certain medical findings documented by Dr. Helgert, such as the lack of atrophy or neurological changes in Bennett's upper and lower extremities, his apparently normal motor power and gait, his lumbar flexion, and his ability to heel and toe walk. While it is true that Dr. Helgert documented rather limited objective findings, he noted that Bennett's complaints of pain and resulting limitations had been consistently reflected in his treating physician's records. Furthermore, it appears the ALJ's discussion of the medical evidence was somewhat selective, as the record also contained findings of restricted lumbar range of motion, lumbar tenderness and muscle spasm, slight sensory decrease of the S1dermatome, reported numbness in the Bennett's lower leg, and positive straight leg testing (R. 163, 181–87, 457–59, 517, 525).

In sum, having reviewed the entire record in some detail, the Court concludes that the ALJ's hypothetical included an implicit finding not supported by substantial evidence. To the extent the ALJ assumed Bennett is capable of performing essentially the full range (or at least a wide range) of light work activity, he incorporated an unsubstantiated finding that Bennett can walk and/or stand for up to 6 hours out of an 8 hour workday, without the need to frequently change positions. Because this finding was included in the hypothetical, the vocational expert's testimony was tainted and does not substantially support the ALJ's conclusion that Bennett is not disabled. *See Chrupcala v.*

*Heckler,* 829 F.2d 1269, 1276 (3d Cir.1987); *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984).

## IV. CONCLUSION

Based upon the foregoing reasons, we will deny the Plaintiff's motion for summary judgment, deny the Commissioner's motion for summary judgment, and remand the instant case to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

An appropriate order follows.

### ORDER

AND NOW, this ___ day of February, 2003, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 5] is DENIED, the Defendant's Motion for Summary Judgment [Doc. No. 7] is DENIED, and the case is hereby REMANDED for further proceedings consistent with this Memorandum Opinion and Order.